DECISION AND JUDGMENT ENTRY
Rachel Burns appeals the decision of the Highland County Court of Common Pleas, Juvenile Division, to place custody of her five children outside of her home. She asserts that the trial court's determination that Highland County Board of Children Services ("the Agency") made reasonable efforts to prevent removal of the children from her home is not supported by the record. Because some competent, credible evidence supports the trial court's finding, we disagree. She also asserts that the trial court did not comply with R.C. 2151.419. Because we find that the trial court failed to comply with the statute, we agree. However, we find the error to be harmless. Rachel finally asserts that the trial court violated R.C. 2151.353(D) by failing to journalize a case plan for each child as part of its dispositional order. Because we find that the trial court journalized no less than five case plans throughout the pendency of this case and because there is no indication that the most recent case plan was not in effect at the time of the trial court's decision, we disagree.
 I.
Rachel is the mother of five children. Russell Benner fathered Anastasia Benner, who was born in 1992. Russell Benner did not appear in any proceeding in the trial court even though he was served by publication. Raymond "Matt" Burns fathered Dominique Burns, who was born in 1992. Timothy Moore fathered Felicia Moore, who was born in 1995. Tony Holman fathered Joshua Holman, who was born in 1997. Darin Loch fathered Nathaniel Burns, who was born in 1999.
Rachel's contact with the Agency began in 1998 when the Agency filed a complaint in the trial court seeking a determination that Joshua was a neglected and dependent child because Rachel's home was hazardous and unsafe and Joshua had been observed in a dirty condition on numerous occasions. This complaint also alleged that Rachel had left the other children unsupervised.
In its case plan, the Agency listed seven concerns and outlined the steps that Rachel must take in order to prevent removal of her children from the home. These concerns included the crowded living conditions of the family, the lack of supervision of the children, Rachel's parenting skills, Rachel's mental health and ability to handle her children, the children's medical needs, failure of Rachel to enroll Dominique in Head Start, and Rachel's ability to comply with Human Services' requirements for assistance. The Agency offered to assist Rachel in addressing these concerns.
On April 28, 1998, Rachel admitted that Joshua was a dependent child. The trial court ordered the Agency to provide protective supervision and ordered that the custody of Joshua remain with Rachel. The trial court approved the Agency's case plan.
In September of 1998 the Agency filed a Semiannual Administrative Review (SAR). The SAR noted that "[t]here has been very little change in the parenting of the children by the mother." The SAR recommended continued protective supervision of the children because Rachel needed to continue to work on the same concerns.
In March of 1999, the Agency again filed an SAR. The Agency added Nathaniel and noted that Joshua appeared to have developmental delays. Although Rachel completed a parenting education program, the caseworker noted that she "ha[d] seen very little application. * * * Joshua is almost always in bed * * *[and] has not yet received his developmental assessment * * *. The amount of stimulation Joshua has received in the past six months would appear to be very limited." The SAR indicated that Rachel had been attending single and group counseling sessions and that Dominique had been attending Head Start. The SAR also indicated that Joshua had been recently admitted to the hospital and there were concerns about his growth and bond with his mother. According to the SAR, "mother expressed no desire to work with the agency in a phone conversation on 03-03-99."
Tony Holman reappeared in the family's life at this time. This concerned the Agency because Tony Holman had a history of domestic violence against Rachel.
On the amended SAR, filed March 8, 1999, Rachel disagreed with the Agency's case plan because "Joshua has been receiving the nutrition and care he needs to be healthy and well developed." After Joshua was assessed at Cincinnati Children's Hospital, Rachel agreed to an amended case plan, which was filed on March 24, 1999, and agreed to follow the Hospital's recommendation about Joshua. The Hospital recommended that Joshua receive additional nutrition and infant stimulation because Joshua was developmentally delayed and was underweight for his age.
On March 29, 1999, the Agency filed a motion for emergency temporary custody of all five of Rachel's children. The Agency alleged that on March 19, 1999, Rachel told the Highland County Sheriff Department that Tony Holman had committed domestic violence against her. Anastasia told authorities that Tony Holman knocked her to the ground during this altercation. The Agency also alleged that Joshua's nutritional needs were not being met. The Agency alleged that Nathaniel had thrush and that Rachel had not been meeting Nathaniel's nutritional needs and had not been changing his diapers in a timely fashion.
On that same day, the trial court vested temporary custody of the five children with the Agency and found that the Agency made all reasonable efforts to prevent placement of the children outside of the home.
The next day, March 30, 1999, the trial court held a hearing on temporary custody. The trial court vested temporary custody of Dominique in her father, Raymond Burns.
On April 23, 1999, the Agency filed a new case plan. The Agency's four main concerns were: (1) Joshua's developmental delays and lower than normal weight; (2) Rachel's poor parenting skills, including, not feeding the children properly, not supervising the children properly, not changing the children's diapers properly, leaving the children in their rooms too long without any stimulation, and failing to treat the children's illnesses; (3) the children's exposure to domestic violence and possible drug trafficking through Rachel's association with Tony Holman; and (4) Rachel's lack of employment or other source of income.
The case plan outlined the changes Rachel had to make in her behavior to address these concerns, including applying the parenting skills she had previously learned or would learn in parenting classes. Also in the case plan, the Agency outlined the reasonable efforts it made to prevent removal of the children. Specifically, the Agency "had attempted to work with the mother for over a year in supportive services in an effort to assist her with meeting the children's needs and keeping them safe. During this time, [Rachel] Burns did not follow through with all of the services and at times she was not cooperative with agency personnel or the service providers. [Rachel] Burns lied to agency workers regarding various matter[s], including the fact that Tony Holman was having daily contact with her and the children which placed them at greater risk due to the past domestic violence * * *." Rachel reviewed the case plan but refused to sign it.
Shortly thereafter, the Agency placed Anastasia with Rebecca Smith, Rachel's sister; Felicia Moore with her paternal grandparents, Robert and Betty Moore; and Nathaniel Burns with his paternal aunt and uncle, Beth and Allen Loch. The Agency twice updated the case plan to reflect the children's new placements. Rachel refused to sign either case plan.
On September 24, 1999 the trial court adjudicated all of the children dependent children. The trial court continued Joshua's adjudication of dependency, and Rachel and the respective fathers who appeared admitted to the dependency of the other four children. As a result, the Agency filed an amended case plan. This case plan recommended continued placement of the children outside of Rachel's home because "[t]he mother has not demonstrated the ability to care for her children at this time. She has completed parenting classes but has failed to demonstrate an improvement in parenting skills during visitation with her children at the agency. Her assessment through Family Recovery indicates some severe psychological impairments, which have yet to be addressed. * * * [Rachel] Burns has proved the agency's concerns valid by continuing a relationship with [Tony] Holman and becoming involved with another man with domestic violence history (sic)." Rachel again refused to sign the case plan.
In the SAR filed on September 22, 1999, the Agency added a new concern to the case plan. The Agency alleged that Rachel was pregnant with her sixth child and requested that she have a blood test to determine whether she was pregnant and inform the Agency of the results. Rachel again refused to sign the case plan.
On September 30, 1999, the children's guardian ad litem filed his report and recommended continued placement of the children outside of Rachel's home.
On October 1 and 2, 1999, the trial court held a hearing on the disposition of Rachel's children. Whether Tony Holman ever lived with Rachel and her children was at issue during the hearing. Rachel testified that he had never lived with her, but may have occasionally stayed over night to help her with the children. Rachel also admitted that she had given a written statement to the Department of Human Services indicating that Tony Holman "moved into my household as of January 7th."
Rachel testified that at the time of the hearing she was enrolled in the Turning Point Program to improve her job skills. She also testified that her visitations with the children were going well.
Rachel's therapist, Randall Massie, testified that Rachel did not exhibit any signs of substance abuse or sexual addiction, but that there were several areas on which Rachel needed to work including, past abuse, paranoia, co-dependency, and unhealthy relationships. Massie admitted that it would take quite a while for Rachel to adequately deal with some of the problems. He also opined that Rachel wanted to be a good mother, but was not ready to have the children placed with her at the time of the hearing.
Debbie Howard, an Agency custody case worker, testified that she had witnessed some of Rachel's visits with her children after Rachel completed parenting classes. She stated that the visits were always very loud, very chaotic and completely out of control. She stated that Rachel normally concentrated on one child while the other children ran around. Howard explained that she had never seen Rachel actually carry out what she supposedly learned in parenting classes. According to Howard, Rachel had refused to work with a previous caseworker on her parenting skills. Howard also testified that when she spoke with Rachel just prior to the hearing, Rachel did not understand why the Agency had taken her children and accused "everyone" of lying about her. Howard recommended, on behalf of the Agency, that that the children stay out of Rachel's home.
After all parties finished presenting their cases, the trial court announced its decision. The trial court stated that it did not believe Rachel's testimony. The trial court found that Rachel put her abusive boyfriend, Tony Holman, "in a priority position over [her] children." The trial court pointed out that the Agency had given her an opportunity through protective supervision of Joshua to improve her situation. The trial court found that it would not be in the best interests of the children to be placed with Rachel. The trial court awarded custody of Anastasia to David and Mary Iiames pursuant to R.C. 2151.353(A)(3). The trial court granted legal custody of Dominique to Raymond Burns, legal custody of Felicia to Robert and Betty Moore, and legal custody of Nathaniel to Darin Loch. After addressing the visitation issues, the trial court ordered the Agency to prepare and file a new case plan pursuant to R.C. 2151.353(D).
The trial court then continued the temporary custody of Joshua in the Agency. The trial court concluded the hearing by finding that the Agency made reasonable efforts to prevent removal of all five children from the home of their mother.
The trial court's written decision and judgment entry reflects its findings and decision from the bench. Rachel appeals and asserts the following assignments of error:
 The trial court's determination under R.C. § 2151.419 that the [Agency] satisfied its burden of proving that it had made reasonable efforts to prevent removal of the children from their home is not supported by the record and is incomplete. Thus, the trial court's removal of custody from appellant violates R.C. 2151.419 and appellant's due process rights under the Ohio and United States Constitutions.
 The trial court committed prejudicial error by failing to journalize a case plan for each child as part of its dispositional order, as required by R.C. § 2151.353(D). Thus, the trial court's removal of custody from appellant violates R.C. § 2151.353
and appellant's due process rights under the Ohio and United States Constitutions.
 II.
In her first assignment of error, Rachel makes two distinct arguments. She first argues that the trial court's finding that the Agency made reasonable efforts to prevent removal of the children from their home is not supported by the record. She then argues that the trial court did not comply with R.C. 2151.419(B)(1) because it failed to describe the services provided by the Agency to the family and why those services did not prevent the removal of the children from the home.
 A.
Rachel's argument that the record does not support the trial court's finding that the Agency made reasonable efforts to prevent removal of the children from their home is essentially a challenge to a finding of fact by the trial court. In reviewing a trial court's factual determinations, we will not reverse as long as the record contains some competent, credible evidence supporting the determination. Sec. Pacific Bank v.Roulette (1986), 24 Ohio St.3d 17, 20. The trial court is in the best position to judge credibility of testimony because it is in the best position to observe the witness's gestures and voice inflections. SeasonsCoal Co. v. Cleveland (1984), 10 Ohio St.3d 77.
Some competent, credible evidence supports the trial court's determination that the Agency made reasonable efforts to prevent removal of the children from their home. In the case plan filed on April 23, 1999, the Agency outlined the reasonable efforts it made to prevent removal of the children. Specifically, the Agency "had attempted to work with the mother for over a year in supportive services in an effort to assist her with meeting the children's needs and keeping them safe. During this time, [Rachel] Burns did not follow through with all of the services and at times she was not cooperative with agency personnel or the service providers. [Rachel] Burns lied to agency workers regarding various matter[s], including the fact that Tony Holman was having daily contact with her and the children which placed them at greater risk due to the past domestic violence * * *." The Agency helped Rachel to sign up for and attend parenting classes, counseling sessions and a job training program. Howard testified that an Agency employee attempted to help Rachel apply the skills she had learned in parenting classes, but Rachel was uncooperative and was often not at home when their appointments were scheduled. Thus, we find that the trial court did not err in finding that the Agency made reasonable efforts to prevent removal of the children from their home.
 B.
We next address Rachel's argument that the trial court failed to comply with R.C. 2151.419(B)(1), which provides:
 (A)(1) At any hearing held pursuant to section 2151.28, division (E) of section 2151.31, or section 2151.314, 2151.33, or 2151.353 of the Revised Code at which the court removes a child from his home or continues the removal of a child from his home, the court shall determine whether the public children services agency or private child placing agency that filed the complaint in the case, removed the child from his home, has custody of the child, or will be given custody of the child has made reasonable efforts to prevent the removal of the child from his home, to eliminate the continued removal of the child from his home, or to make it possible for the child to return safely home. The agency shall have the burden of proving that it has made those reasonable efforts. * * *
 (B) The court shall issue written findings of fact setting forth its determination under division (A) of this section. In its written findings of fact, the court shall briefly describe the relevant services provided by the agency to the family of the child and why those services did not prevent the removal of the child from his home or enable the child to return home.
Thus, R.C. 2151.419 places an affirmative duty upon the trial court to make the express findings and the conclusion required by R.C. 2151.419
(A) and (B). In re Hulsey (September Sept. 12, 1995), Adams App. No. 95CA599, unreported (trial court erred in failing to make explicit findings regarding whether the agency undertook reasonable actions to reunify parent and child). However, failing to make such findings may be harmless error if it is apparent from the record that the agency's efforts at reunification were reasonable and the trial court's findings of fact clearly imply the reasonableness of the agency's efforts. In reHulsey, fn 6, citing In re Pieper Children (1993), 85 Ohio App.3d 318,326; Civ.R. 61. Here, the record shows that the Agency's efforts to prevent removal of the children and to reunify the children with Rachel were reasonable. The Agency provided Rachel with assistance in obtaining parenting classes, individual and group therapy, and job training. The Agency also worked with Rachel in an attempt to improve Joshua's health and her parenting skills before it even filed for temporary custody of the other children. The trial court's written findings of fact imply the reasonableness of these efforts. Thus, we find that any error on the part of the trial court in failing to comply with R.C. 2151.419 is harmless. Accordingly, we overrule Rachel's first assignment of error.
 III.
In her second assignment of error, Rachel argues that the trial court erred because it failed to journalize a case plan for each child as part of its dispositional order as required by R.C. 2151.353(D). She asserts that this failure violated her constitutional due process rights.
R.C. 2151.353(D) requires a trial court to journalize a case plan as part of its dispositional order. In this case, the trial court journalized no less than five case plans during this case. There is no indication that the most recent case plan filed prior to the trial court's final decision was not still in effect at the time of the final decision. Therefore, we find that the trial court did not violate R.C. 2151.353 by failing to journalize a new case plan simultaneously with its decision. See In re Justice (April 24, 2000), Brown App. Nos. CA99-05-009 through CA99-05-017, unreported (trial court complied with R.C. 2151.353 by journalizing case plans many times throughout a four year period while the children were placed outside of their home). Accordingly, we overrule Rachel's second assignment of error.
 IV.
In sum, we overrule both of Rachel's assignments of error and affirm the judgment of the trial court.
 JUDGMENT ENTRY
It is ordered that the JUDGMENT BE AFFIRMED and that Appellee recover of Appellant costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Juvenile Division of the Highland County Court of Common Pleas to carry this judgment into execution.
Any stay previously granted by this Court is hereby terminated as of the date of this entry.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Abele, J. and Evans, J.: Concur in Judgment and Opinion.
 ______________________ Roger L. Kline, Presiding Judge